AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Google LLC Account aaliyah02.eg@gmail.com,<br>believed to be used by Emanuel Mitchel GUTIERREZ<br>(the "Subject Account") | )<br>)<br>)  Case No.  26-mj-00176<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952, 960 | Importation of Controlled Substances |
| 21 U.S.C. § 963 | Conspiracy |

The application is based on these facts:
See Affidavit of HSI SA Andrew Gonzales, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ANDREW T GONZALES *Digitally signed by ANDREW T GONZALES Date: 2026.01.14 09:52:50 -08'00'*

*Applicant's signature*

Andrew Gonzales HSI SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __Telephone__ *(specify reliable electronic means)*.

Date: 01/14/2026

*Judge's signature*

City and state:  San Diego, CA       Hon. Karen S. Crawford, United States Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Special Agent Andrew Gonzales, Homeland Security Investigations ("HSI") being duly sworn, hereby state as follows:

### I

### INTRODUCTION

1. I submit this affidavit in support of an application for a search warrant for information associated with the following Google LLC ("Google") account that is stored at premises owned, maintained, controlled, or operated by Google, an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California 94043:

aaliyah02.eg@gmail.com, believed to be used by Emanuel Mitchel GUTIERREZ (the "**Subject Account**")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Emanuel Mitchel GUTIERREZ ("Defendant" or "GUTIERREZ") for importing approximately 57.94 kilograms (127.46 pounds) of cocaine from Mexico into the United States.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Subject Account**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

### II

### AGENT BACKGROUND

3. I have been employed as a Special Agent with Homeland Security Investigations ("HSI") since 2021. I am currently assigned to the HSI Office of the Special Agent in Charge, in Calexico, California. I am a graduate of the Federal Law Enforcement

Training Center in Glynco, Georgia.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry, Otay Mesa Port of Entry, Tecate Port of Entry, and Calexico Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that drug traffickers often require the use of a cellular telephone to negotiate times, places, schemes, and manners for importing

federally controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. The cellular telephone enables drug traffickers to maintain contact with associates, suppliers, and customers, often through messaging services, including but not limited to Google Duo, Google Messages, Google Hangouts, Google Meet, and Google Chat, as well as through the use of third-party communication applications. I also know that drug traffickers often create secondary phone numbers through applications, like Google Voice, for the purpose of making calls and sending messages to individuals that the user seeks to compartmentalize from their primary phone number. Additionally, I know that drug traffickers often document their illicit activities through photographs stored on their telephones. For example, traffickers often maintain photographs of, among others, narcotics, pay-and-owe ledgers, and money proceeds from the trafficking of controlled substances. I also know that traffickers often use location services, such as Maps and Waze (a traffic tracking service), to coordinate locations for meeting with co-conspirators, including to transfer cash representing the ill-gotten gains from the trafficking. I also know that much of the aforementioned data is often backed-up on virtual cloud-based services, such as those offered by Google.

7. Specifically, searches of the Google accounts of individuals involved in the importation of narcotics may yield:

a. Electronic records, such as communications, photographs, audio files, videos, and location data, tending to indicate efforts to import federally controlled substances, which may include evidence of unexplained wealth;

b. Evidence indicating how and when the **Subject Account** was accessed or used to determine user(s)' travel to or presence at locations involved in efforts to import federally controlled substances, such as stash houses, load locations, or other meet/delivery points;

c. Evidence indicating the motive, intent, or consciousness of guilt of the user(s) of the **Subject Account** as it relates to the crimes under investigation, *i.e.*, the importation of federally controlled substances;

d. Evidence indicating the identity of the person(s) who created or used the **Subject Account**; and;

e. Evidence indicating the identity of the person(s) who communicated with the **Subject Account** about the importation of federally controlled substances, including records that help reveal those person(s)'s whereabouts

## III

## FACTS SUPPORTING PROBABLE CAUSE

8. On April 8, 2025, a Customs and Border Protection Officer ("CBPO") was assigned to primary inspection vehicle lane #5 of the Calexico, California West Port of Entry. At approximately 8:30 p.m., Emanuel Mitchel GUTIERREZ arrived at primary inspection. GUTIERREZ was the driver of a Chevrolet Tahoe bearing California license plates. GUTIERREZ was accompanied by his minor daughter and GUTIERREZ and his daughter both claimed to be United States citizens. The CBPO obtained a negative customs declaration from GUTIERREZ and conducted computer database queries. The CBPO received a computer-generated alert and referred GUTIERREZ to the secondary inspection area.

9. In secondary inspection, GUTIERREZ was instructed to drive his vehicle through the Z-Portal X-ray machine and anomalies were detected in the roof area. A CBPO, who is a certified canine handler, used his canine to search the vehicle and noticed his canine alerted to the interior of the vehicle. During a search of the vehicle, CBPOs discovered 50 packages concealed in the roof area of the vehicle. CBPOs noticed the packages contained a white powdery substance that field tested positive for cocaine. The total weight was determined to be approximately 57.94 kilograms (127.46 pounds) of cocaine.

10. GUTIERREZ was placed under arrest and charged with a violation of Title 21, United States Code sections 952 and 960, for Importation of a Controlled Substance.

11. GUTIERREZ's cell phone was found and seized by CBPOs during a search of GUTIERREZ's vehicle, which was located in a cupholder of the center console of the vehicle.

*Attribution of the Subject Account to GUTIERREZ*

12. On December 16, 2025, the Honorable Jill L. Burkhardt signed a search warrant for GUTIERREZ's cell phone, 25mj6970-JLB

13. A review of the forensic download of the cell phone, pursuant to the search warrant, indicated that GUTIERREZ used the account aaliyah02.eg@gmail.com, the **Subject Account**, for Google services on his cell phone.

14. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Subject Account** to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics.

15. Based upon my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Subject Account** for data beginning on **March 8, 2025** (one month prior to the offense), up to and including **April 8, 2025** (the date of the offense).

## IV

## BACKGROUND CONCERNING GOOGLE

16. Google is a United States company that offers to the public through its Google accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google

Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google account.

17. In addition, Google offers an operating system (OS) for mobile devices, including cellular phones, known as Android. Users of Android devices are prompted to connect their device to a Google account when they first turn on the device, and a Google account is required for certain functionalities on these devices.

18. When individuals register with Google for a Google account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment. Signing up for a Google account automatically generates an email address at the domain gmail.com. That email address is the log-in username for access to the Google account.

19. In addition to the above, Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol (IP) addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the Google account.

20. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google account, a user can connect to Google's full suite of services offered to the general public, including those described in further detail below.

21. For example, Google provides email services (called Gmail) to Google

accounts through email addresses at gmail.com which can be accessed, including through a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google account by the user. Google preserves emails associated with a Google account indefinitely, unless the user deletes them.

22. Additionally, Google provides several messaging services, including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user has not disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

23. Google also provides an address book for Google accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users also have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves Contacts indefinitely unless the user deletes them. Contacts can be accessed from the same browser window as other Google products, such as Gmail.

24. Additionally, Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone to Google Photos. Google preserves files stored in Google Photos indefinitely unless the user deletes them.

25. Google also offers a map service called Google Maps which can be searched

for addresses or points of interest. Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can find and plan an itinerary using Google Trips. A Google account is not required to use Google Maps, but if users log into their Google account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely unless the user deletes it.

26.    Additionally, Google collects and retains data about the location at which Google account services are accessed. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

## V
## ITEMS TO BE SEIZED

27. Investigators know that individuals working with criminal organizations often use multiple communication platforms in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Indeed, based on training and experience, investigators are aware that, in addition to telephone and text messaging services (*i.e.*, MMS and SMS), other communication platforms accessible through the telephone, like Duo, Messages, Hangouts, Meet, and Chat, and third-party communication applications, are also often used by drug traffickers to engage in their illegal activity. These communication services can be used to coordinate payments and meetings, conduct negotiations and other matters relating to the criminal scheme, and to send location data, photographs, audio files, and/or videos, concerning the criminal activity, all of which are available from Google as outlined above. Based on my training and experience, voicemails, audio files, photographs, videos, and documents also are often created and used in furtherance of criminal activity. Map searches and location data, which also are available from Google, also may show the presence at known stash locations or other significant locations. Thus, stored communications and files connected to the **Subject Account** may provide direct evidence of the offenses under investigation. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

28. Based on training and experience, investigators are aware that evidence of who was using the **Subject Account** and from where, and evidence related to criminal activity of the kind at issue here, may be found in the files and records described in Attachment B and available from Google. For example, account activity, like internet searches, may provide relevant insight into an account owner's state of mind as it relates to the offenses under investigation, such as the owner's motive and intent to commit a crime (*e.g.*, communications indicating a plan to commit a crime) or consciousness of

guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement). Communications, contacts, photographs, internet searches, location information and other information that Google can produce related to the **Subject Account** also can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation, including addresses and/or vehicles used by the subjects of the investigation. And, the identification of apps downloaded from Google Play may reveal services used in furtherance of the crimes under investigation, such as services used to communicate with co-conspirators. Therefore, Google's servers are likely to contain stored electronic communications and information constituting evidence of the crimes under investigation.

29. Google's servers also are likely to contain "user attribution" evidence. Such evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, device information, the data associated with the foregoing (such as location, date, and time information), photographs, videos, and audio files may be evidence of who used or controlled the **Subject Account** at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices – and thereby which user(s) – likely accessed the **Subject Account**. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

## VI
## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

19. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Google are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Google for the relevant accounts and then

to analyze the contents of those accounts on the premises of Google. The impact on Google's business would be disruptive and severe.

20. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the **Subject Account**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Google, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, HSI seeks authorization to allow Google to make a digital copy of the entire contents of the account subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

21. Analyzing the data to be provided by Google may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review

even more time consuming and may also require the examiner to review each page or record for responsive material.

22. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this court.

23. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the **Subject Account** and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

24. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VII
## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

30. The United States has not attempted to obtain this data by other means.

## VIII
## CONCLUSION

31. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Subject Account** will yield evidence of Defendant's violations of Title 21, United States Code, Sections 952, 960 and 963. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item

described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

ANDREW T GONZALES
Digitally signed by ANDREW T GONZALES
Date: 2026.01.14 09:53:32 -08'00'

Special Agent Andrew Gonzales
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 14th day of January 2026.

Hon. Karen S. Crawford
United States Magistrate Judge

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

This warrant applies to information associated with the following Google LLC ("Google") account that is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

- aaliyah02.eg@gmail.com, believed to be used by Emanuel Mitchel GUTIERREZ (the "**Subject Account**")

## ATTACHMENT B
## ITEMS TO BE SEIZED

I.  **Service of Warrant**

The officer executing the warrant shall permit Google LLC ("Google"), as custodian of the files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II. **Information to be Disclosed by Google**

To the extent that the information is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any information that has been deleted but is still available to Google or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Google is required to disclose to the United States for the account or identifier listed in Attachment A, the following information from **March 8, 2025** (one month prior to the offense), until **April 8, 2025** (the date of the offense):

 A. All subscriber and user information pertaining to the **Subject Account**, in any form kept, including:

  1. Names (including subscriber names, usernames, and screen names);

  2. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

  3. Telephone numbers, including SMS recovery and alternate sign-in numbers;

  4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol (IP) addresses) associated with those sessions, including log-in IP addresses;

  5. Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address,

     SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers;

  6. Length of service (including start date and creation IP) and types of service utilized;

  7. Means and source of payment (including any credit card or bank account number); and,

  8. Change history.

B. All device information associated with the **Subject Account**, including but not limited to, manufacture names, model numbers, serial numbers, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

C. Records of user activity for each connection made to or from the **Subject Account**, including, for all Google services, the date, time, length, and method of connection, data transfer volume, usernames, source and destination IP address, name of accessed Google service, and all activity logs;

D. The contents of all text, audio, and video messages associated with the **Subject Account**, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

E. Any records pertaining to the user's contacts, including address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

F. The contents of all media associated with the **Subject Account** in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the

        account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

G. All maps data associated with the **Subject Account**, including Google Maps, including all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history; and,

H. All Location History and Web & App Activity indicating the location at which the **Subject Account** was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history;

## III. Information to be Seized by the United States

All information described above in Section II that constitutes evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of federally controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, those violations involving the user(s) of the **Subject Account**. Specifically:

A. Electronic records, such as communications, photographs, audio files, videos, and location data, tending to indicate efforts to import federally controlled substances, which may include evidence of unexplained wealth;

B. Evidence indicating how and when the **Subject Account** was accessed or used to determine user(s)' travel to or presence at locations involved in efforts to import federally controlled substances, such as stash houses, load locations, or other meet/delivery points;

C. Evidence indicating the motive, intent, or consciousness of guilt of the user(s) of the **Subject Account** as it relates to the crimes under investigation, *i.e.*, the importation of federally controlled substances;

D. Evidence indicating the identity of the person(s) who created or used the **Subject Account**; and,

E. Evidence indicating the identity of the person(s) who communicated with the **Subject Account** about the importation of federally controlled substances, including records that help reveal those person(s)'s whereabouts.